UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JAMES YOUNG, | CASE NO. 3:22-cv-5915 |
| Plaintiff, | ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CARLOS DEL TORO, Secretary of the Navy, | |
| Defendant. | |

**INTRODUCTION**

This Matter comes before the Court on Defendant Carlos Del Toro's Motion for Summary Judgment. (Dkt. No. 14.) Having reviewed the Motion, Plaintiff James Young's Response (Dkt. No. 19), the Reply (Dkt. No. 21), and all supporting materials, the Court GRANTS in part and DENIES in part Defendant's Motion.

1

## BACKGROUND

2

**A.    Codes and terms**

3

        The Puget Sound Naval Shipyard and Intermediate Maintenance Facility ("Shipyard") is

4

organized into departments, each designated by a number referred to as "codes". For example,

5

the Engineering & Planning Department is referred to as Code 200, while the Radiological

6

Controls Office is referred to as Code 105. To orient the dispute, the Court summarizes the

7

handful of codes relevant to the gravamen of Young's claims as follows:

8

| Code No. | Brief Description |
|---|---|

9
10
11

| 105.3 | Young's code of record, where he was first hired by the Shipyard to work as physical science technician. (Declaration of James Strong (Dkt. No. 18) Ex. 7 ("Young 1st Dep.") at 26, 32–33.) After his workplace injury, however, he could not perform the physical duties of a physical science technician, so he was temporarily assigned, or "loaned out," to other Codes. (Id. at 32–33.) |

12
13
14

| 105.6 | Young was temporarily assigned to Code 105.6, the Shipyard's Radiological Emergency Planning Division, between September/October 2017 and February 2018. (Declaration of Chalmers Johnson (Dkt. No. 20) Ex. C ("Payne Dep.") at 7; Young 1st Dep. at 35.) |

15

|  | He would request a second temporary assignment to Code 105.6 in October 2018, but would be referred to the Injured Worker Program ("IWP") instead. |

16
17

| 400 | Young was temporarily assigned to Code 400 (specifically Code 440.24) between February and September 2018 as a purchasing agent. (Young 1st Dep. at 35, 40–41.) He then returned to Code 105.3. |

18
19

|  | Young would eventually seek permanent assignment to Code 400 as a contract specialist. (Compl. ¶¶ 4.10–13.) |

20

| 246 | Young was temporarily assigned to Code 246 in October 2018, where he performed administrative work until he left the Shipyard in January 2020. (Young 1st Dep. at 46–47; Strong Decl. Ex. 8 ("Young 2d Dep.") at 50–51.) |

21

**B.    Young's initial assignment to Code 105.3**

22

        Young began his employment at the Shipyard in 2016 as a physical science technician

23

assigned to Code 105.3. (Young 1st Dep. at 26, 31–32.) On January 20, 2017, Young suffered a

24

workplace injury while participating in a practice drill and suffered severe damage to his back and hip. (Id. at 27, 29.) Young's injury prevented him from performing certain aspects of his job, such as wearing full anti-contamination clothing or carrying certain equipment, but he was still able to perform administrative duties. (Id. at 31–32; Johnson Decl. Ex. T ("Young EEO Dep.") at 19.) As a result, Code 105.3 would loan Young to other codes on a temporary basis. (Young 1st Dep. at 31–33.) During this time, the Shipyard listed Young's medical condition as "recovering". (Strong Decl. Ex. 5 at 3.)

One of Young's temporary assignments was to Code 105.6, the Shipyard's Radiological Emergency Planning Division, where he was supervised by Jared Payne. (Payne Dep. at 7.) Young worked in Code 105.6 for three to four months, where he was a "wonderful" employee who became friends with Payne, who himself suffered from a back injury. (Id. at 8, 9, 11.)

On January 16, 2018, the Shipyard declared Young to be permanently disabled due to his injuries. (Johnson Decl. Ex. E.)

**C.     Young's application to Code 400**

Upon completion of his temporary assignment to Code 105.6, Young was loaned out to Code 400, where he performed the duties of a purchasing agent. (Young 1st Dep. at 35, 41.) Young liked his work in Code 400, and in he eventually met with Shipyard management regarding a permanent assignment to that code as a contract specialist. (Young EEO Dep. at 12; Young 2d Dep. at 18.) That meeting took place in April 2018, and included (among others), members of Code 400's management team as well as members of the Shipyard HRO—including James Alexander. (Young EEO Dep. at 12; Young 2d Dep. at 18.) HRO was solely responsible for determining Young's eligibility for the contract specialist position. (Declaration of James Alexander ¶ 4 (Dkt. No. 16); Declaration of Cindy Juarez ¶ 4 (Dkt. No. 17).)

1    After reviewing Young's college transcripts, Alexander told Young that he needed a 3.0

2    grade-point average and 24 credit hours in business courses to qualify for the contract specialist

3    position. (Strong Decl. Ex. 1; Alexander Decl. ¶ 3.) Young's grade-point average was 2.99,

4    which was "rounded off to [an acceptable] 3.0," but he fell four credit hours short of the

5    requirement. (Strong Decl. Ex. 1; Young 2d Dep. at 69–70.) Upon Alexander's recommendation,

6    Young took two additional business courses over the Summer of 2018. (Young 2d Dep. at 65–

7    66.) He received a combined 3.5 grade-point average in those two courses, and promptly

8    resubmitted his transcripts to HRO in September 2018 for renewed consideration. (Johnson Decl.

9    Ex. F at ECF No. 115–18; Young 2d Dep. at 65–66.)

10    After reviewing Young's transcripts, Alexander determined that Young did not qualify

11    for the position based on his "grade-point average, degree, and prior experience." (Alexander

12    Decl. ¶ 3.) At the time, Alexander only told Young that he did not meet the GPA requirements

13    for the position. (Strong Decl. Ex. 2.) Defendant now admits that this calculation was incorrect,

14    and notes that there is no record of how (or whether) "other considerations about Young's prior

15    experience or educational background played into Alexander's determination." (Mot. at 5.)

16    **D. Young's referral to the Injured Worker Program**

17    Young's assignment to Code 400 ended shortly after being denied the contract specialist

18    position. (Young 1st Dep. at 44.) Before he returned to Code 105.3, Young reached out to Payne

19    in Code 105.6 to see whether there was work available for him to take on in a temporary

20    capacity. (Young 2d Dep. at 41–42; Payne Dep. at 16–17.) Payne recalls telling his direct

21    supervisor that he had work for Young but did not himself submit a request for Young's

22    assistance in Code 105.6. (Payne Dep. at 16–17.)

23

24

1    On October 1, 2018, Young met with Amber Harper, a resource manager for Code 105.3, and

2 requested another temporary assignment to Code 105.6. (Johnson Decl. Ex. B ("Harper Dep.") at

3 8–9, 19; Young 2d Dep. at 41.) Harper's role was to find Young a job within Code 105.3,

4 "unless a division outside of 105.3 request[ed] assistance from a 105.3 employee." (Harper Dep.

5 at 25.) However, Harper had not received such a request from Code 105.6. (Id. at 27.) Nor did

6 her job require her to contact Payne or further investigate Young's claim that Code 105.6 had

7 requested his assistance. (Id.) At the time of the meeting, Harper had not yet discussed Young's

8 placement with her supervisors and excused herself from the meeting for approximately fifteen

9 minutes to do so. (Id. at 22–24; Johnson Decl. Ex. F at 3.) She does not remember whether she

10 met with her supervisors at all. (Harper Dep. at 22–24.) When she returned to the meeting, she

11 informed Young that there was no work available for him in Code 105.3 and referred him to the

12 IWP. (Young 1st Dep. at 45–46; Harper Dep. at 18.; Declaration of Ryan Newton ¶ 3 (Dkt. No.

13 15).)

14 **D.    Young's EEO claim and assignment to Code 246**

15    On or around October 1, 2018, Young reported to IWP and met with Ryan Newton.

16 (Newton Decl. ¶ 4.) Newton informed Young that Codes could not request an individual

17 employee for assignment for IWP; instead, the program assigned employees based on

18 qualifications and how long the employee may have been waiting for an assignment. (Newton

19 Decl. ¶¶ 5, 7.) At that time, Young raised that he might want to file an EEO complaint, which

20 Newton allegedly called "entirely pointless." (Young 2d Dep. at 64–65.)

21    Eight days after reporting to IWP, the Shipyard sent Young a Notice of Proposed

22 Enforced Leave. (Strong Decl. Ex. 3.) On the same day he received the Notice, Young filed an

23 Informal EEO Complaint alleging only that he suffered discrimination based on his physical

24

1    disability when he was not selected for the Code 400 job or for temporary assignment to Code

2    105.6. (Id. Ex. 6.) He did not claim to have suffered reprisal for his participation in an EEO

3    complaint. (Id.) Young's formal EEO complaint, filed in November, similarly contained only

4    disability discrimination allegations. (Id. Ex. 5.)

5         On October 24, 2018, the Shipyard rescinded the Notice of Proposed Enforced Leave.

6    (Strong Decl. Ex. 4.) The day after rescinding the Notice, the Shipyard assigned Young to a

7    long-term temporary assignment to Code 246. (Johnson Decl. Ex. N at 7.) At Code 246, Young

8    performed strictly administrative duties, such as "writing memos, doing headcounts, gathering

9    supplies [and] time codes," all tasks that were different than what he had expected from an

10   assignment to Code 105.6. (See Young 2d Dep. at 51–52.) Young would stay on temporary

11   assignment to Code 246 until March 2020, when he left the Shipyard to work for the Department

12   of Energy as a contract specialist. (Young EEO Dep. at 26–27.)

13   **E.    Young's lawsuit**

14        Young filed this lawsuit on November 11, 2022, alleging that he was discriminated

15   against due to his disability when (1) he was not selected for the contract specialist position with

16   Code 400, and (2) he was sent to the IWP rather than a temporary work assignment in Code

17   105.6. (Compl. ¶¶ 5.9, 6.9.) He also claims that he was retaliated against for engaging in activity

18   protected under the Rehabilitation Act. (Compl. ¶¶ 7.2–7.5.)

19        Defendant now moves for summary judgment on all claims. (Dkt. No. 14.)

20                                    **ANALYSIS**

21   **A.    Legal Standard**

22        Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

23   file, and any affidavits show that there is no genuine issue as to any material fact and that the

1   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

2   an issue of fact exists, the Court must view all evidence in the light most favorable to the

3   nonmoving party and draw all reasonable inferences in that party's favor. <u>Anderson v. Liberty</u>

4   <u>Lobby, Inc.</u>, 477 U.S. 242, 248–50 (1986). A genuine issue of material fact exists where there is

5   sufficient evidence for a reasonable factfinder to find for the nonmoving party. <u>Id.</u> at 248. The

6   moving party bears the initial burden of showing that there is no evidence which supports an

7   element essential to the nonmovant's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

8   Once the movant has met this burden, the nonmoving party then must show that there is a

9   genuine issue for trial. <u>Anderson</u>, 477 U.S. at 250. If the nonmoving party fails to establish the

10  existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

11  matter of law." <u>Celotex</u>, 477 U.S. at 323-24.

12  **B.      Young's disability-discrimination claims**

13          Young first alleges that Defendant violated the Rehabilitation Act, 29 U.S.C. §§ 791 <u>et</u>

14  <u>seq.</u>, by impermissibly discriminating against him based on his disability. Specifically, Young

15  claims that he was discriminated against when Defendant: (1) did not select him for a permanent

16  position as a contract specialist in Code 400, and (2) did not assign him to a temporary work

17  assignment in Code 105.6. (Compl. ¶¶ 5.9, 6.9.)

18          To assess claims brought under the Rehabilitation Act, courts in this circuit rely on the

19  burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

20  <u>See</u> <u>Mustafa v. Clark County. Sch. Dist.</u>, 157 F.3d 1169, 1174–76 (9th Cir. 1998) (applying

21  framework to Rehabilitation Act claim.) First, the plaintiff must establish a <u>prima facie</u> case by

22  showing that they are: "(1) a person with a disability; (2) otherwise qualified for employment;

23  and (3) suffered discrimination because of [their] disability." <u>Mattioda v. Nelson</u>, 98 F.4th 1164,

24

1178 (9th Cir. 2024). This burden is not designed to be onerous, as "the plaintiff need only

provide evidence that <u>suggests</u> that the decision was based on a discriminatory criterion illegal

under the [Civil Rights] Act." <u>See</u> <u>Diaz v. Am. Tel. & Tel.</u>, 752 F.2d 1356, 1361 (9th Cir. 1985)

(emphasis in original) (<u>citing</u> <u>Texas Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 253 (1981);

<u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 358 (1977)).

      Should the plaintiff establish their <u>prima facie</u> case of disability discrimination, the

burden then shifts to the employer to provide a legitimate, non-discriminatory reason for its

action. <u>Mattioda</u>, 98 F.4th at 1178. "This burden is one of production, not persuasion; it can

involve no credibility assessment." <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 142

(2000) (quotation omitted); <u>see also</u> <u>Opara v. Yellen</u>, 57 F.4th 709, 725–27 (9th Cir. 2023).

      "Once a defendant presents a legitimate, non-discriminatory reason for its actions, the

presumption of discrimination 'drops out of the picture' and the plaintiff has the new burden of

proving that the proffered reasons were a pretext for discrimination." <u>Lindsey v. SLT Los</u>

<u>Angeles, LLC</u>, 447 F.3d 1138, 1148 (9th Cir. 2006) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509

U.S. 502, 510–11 (1993)). Plaintiff may prove pretext "either directly by persuading the court

that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256. Indirect—

or circumstantial—evidence, must be "specific and substantial," but that requirement is

"tempered by [] observation[s] that a plaintiff's burden to raise a trailable issue of pretext is

hardly an onerous one." <u>France v. Johnson</u>, 795 F.3d 1170, 1175 (9th Cir. 2015), <u>as amended on</u>

<u>reh'g</u> (Oct. 14, 2015). The Ninth Circuit has "repeatedly held that it should not take much for a

plaintiff in a discrimination case to overcome a summary judgment motion." <u>Id.</u> (collecting

cases).

1          **1.      Young's claim regarding the Code 400 contract specialist position**

2          Defendant first argues that Young cannot show that the proffered reason why he was not

3    hired into Code 400 was pretextual. The Court disagrees.

4          "[A] disparate treatment plaintiff can survive summary judgment without producing any

5    evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a

6    genuine issue of material fact regarding the truth of the employer's proffered reasons." Chuang

7    v. Univ. of California Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000); see also

8    Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's

9    explanation is unworthy of credence is simply one form of circumstantial evidence that is

10   probative of intentional discrimination, and it may be quite persuasive.").

11         Young raises a genuine issue of material fact regarding the veracity of Defendant's

12   proffered non-discriminatory reason for failing to hire him into Code 400. (Resp. at 15.) Here,

13   Young was told that he was not hired into Code 400 because he lacked the "grade-point average,

14   degree, and prior experience" necessary to qualify for the position. (Alexander Decl. ¶ 3.;

15   Johnson Decl. Ex. J.) Young was not given any other justification for his application being

16   denied. Indeed, Defendant now admits that (1) its legitimate, non-discriminatory reason was

17   based on an erroneous calculation, and (2) that it cannot show how Alexander and the HRO

18   calculated Young's GPA or weighed Young's prior experience and educational background in

19   the hiring decision. (See Mot. at 4–5.) A fact finder may "reasonably infer from the falsity of

20   [Defendant's] that [it] is dissembling to cover up a discriminatory purpose," and may even

21   consider Defendant's dishonesty regarding Young's qualifications as "affirmative evidence of

22   guilt." Reeves, 530 U.S. at 147 (quoting Wright v. West, 505 U.S. 277, 296 (1992)). The Court is

23   satisfied that Young has shown a genuine issue of material fact as to whether Defendant's faulty

24

1    (or nonexistent) calculation of his GPA was pretextual. See Coghlan v. Am. Seafoods Co. LLC.,

2    413 F.3d 1090, 1097 (9th Cir. 2005) ("[M]any cases where the evidence is sufficient for a

3    rational trier of fact to conclude that the employer is lying about its reason for firing or demoting

4    the plaintiff, summary judgment will be inappropriate on that basis alone because a jury could

5    reasonably view the employer's lie as evidence of its guilt.").

6          Defendant also claims that the calculation error itself was a legitimate, non-

7    discriminatory reason for failing to hire Young and that Young cannot show pretext by simply

8    pointing to the mistake. (See Mot. at 10; Reply at 3–4.) Specifically, Defendant's argument is

9    built upon propositions from a pair of Ninth Circuit cases: O'Brien v. R.C. Willey Home

10   Furnishings, 748 F. App'x 721, 724 (9th Cir. 2018) ("a mistake can be a legitimate, non-

11   discriminatory reason"), and Hittle v. City of Stockton, California, 101 F.4th 1000, 1017–18 (9th

12   Cir. 2024) (to prove pretext, a plaintiff "cannot simply show the employer's decision was wrong,

13   mistaken, or unwise."). But the statements of law derived from those cases are relevant in cases

14   involving California's Fair Employment and Housing Act ("FEHA"). See Dep't of Fair Emp. &

15   Hous. v. Lucent Techs., Inc, 642 F.3d 728, 746 (9th Cir. 2011) (quoting Morgan v. Regents of

16   the Univ. of Cal., 105 Cal.Rptr.2d 652, 670 (2000)). As this is not a case involving FEHA

17   claims, Defendant's reliance on those propositions is unavailing.

18         And even if Defendant's error could be a legitimate, non-discriminatory reason that it

19   failed to hire Young, there remain material questions of fact as to when Defendant discovered the

20   error (or, as Young alleges, whether the GPA calculation ever occurred.) The record shows that

21   Young took immediate steps to correct the GPA miscalculation by, among other things,

22   discussing the issue with Alexander and filing a formal EEO complaint describing the

23   miscalculation. (See Young 1st Dep. at 22; Strong Decl. Ex. 5 at 5.) The factfinder could

1   determine that Defendant should have known of its mistake as early as October 2018, and infer

2   discriminatory intent by Defendant failing to remedy—or even acknowledge—the error.

3      For those reasons, the Court DENIES Defendant's motion for summary judgment as to

4   Young's first disability discrimination claim.

5      **2.  Young's claim regarding his assignment to the IWP rather than Code 105.6**

6      Defendant next argues that Young cannot satisfy the McDonnell Douglas test regarding

7   his claim that "the decision not to send him to Code 105.6 and instead assign him to the IWP,"

8   was discriminatory (Mot. at 11–13.) The Court agrees.

9      As an initial matter, Defendant first argues that Young cannot make his prima facie case

10  because the decision to send Young to the IWP rather than Code 105.6 was not an adverse

11  employment action. The record reflects otherwise. An adverse action is one that "materially

12  affects the compensation, terms, conditions, or privileges of employment." Campbell v. Haw.

13  Dep't of Educ., 892 F.3d 1005, 1012 (9th Cir. 2018). "Whether a particular reassignment is

14  materially adverse depends upon the circumstances of the particular case, and should be judged

15  from the perspective of a reasonable person in the plaintiff's position, considering all the

16  circumstances." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71 (2006) (quotations

17  and citations omitted). While Defendant is correct that Young's salary, benefits, or opportunities

18  were not adversely affected by him not going to Code 105.6, (see Mot. at 12,) Young's

19  deposition testimony reflects that the work he performed for Code 246 (after being assigned to

20  IWP) was potentially less desirable than the work he expected to perform for Code 105.6. Young

21  believed that a temporary assignment to Code 105.6 would be "administrative in nature" but

22  would also encompass some non-clerical tasks such as "help[ing] run the computers [and]

23  diagnos[ing] for the drills, et cetera." (Young 2d Dep. at 51.) Meanwhile, his eventual

24

ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 11

1   assignment to Code 246 was "strictly administrative in nature," and included "writing memos,

2   doing headcounts, gathering supplies [and] time codes," which Young referred to as "all stuff

3   that was not done in 105.6." (Id. at 51–52.) Like the reassignment at issue in Burlington, where

4   the jury had evidence that the duties of a track laborer were "by all accounts more arduous and

5   dirtier" than those of a forklift operator, the differences between Young's duties in Code 105.6

6   and Code 246 present a material question as to whether "the reassignment of responsibilities

7   would have been materially adverse to a reasonable employee." 548 U.S. at 71. When viewing

8   the evidence in a light most favorable to Young, the Court finds that he has made his prima facie

9   case of disability discrimination.

10          Defendant next argues that Young's claim fails to show pretext, particularly in light of

11   the "same-actor" presumption. (Mot. at 12–13.) The Court agrees.

12          When the "same actor is responsible for both the hiring and the firing of a discrimination

13   plaintiff, and both actions occur within a short period of time, a strong inference arises that there

14   was no discriminatory action." Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1096 (9th

15   Cir. 2005). The principle extends to adverse employment actions outside of hiring and firing,

16   such as when "the plaintiff was not actually fired but merely offered a less desirable job

17   assignment." Id. The record here shows that throughout Young's time at the Shipyard, Defendant

18   had provided him opportunities to work for other Codes on a temporary basis, including

19   desirable assignments in Codes 105.6 and 400. These temporary assignments happened both

20   before and after Young was deemed permanently disabled. Therefore, the Court finds that that

21   Defendant is entitled to a favorable same-actor inference when assessing step three of the

22   McDonnell Douglas framework regarding Young's second disability-discrimination claim. See

23   Schechner v. KPIX-TV, 686 F.3d 1018, 1027 (9th Cir. 2012) (applying the same-actor inference

24

1   on summary judgment after finding that the employer had "signed [the employees] to new

2   contracts not long before they [were] laid off.").

3       Young, does not discuss (let alone rebut) the same-actor theory raised by Defendants.

4   Rather, Young frames his pretext argument around the proposition that "he is his own

5   comparator for a disparate treatment argument." (Resp. at 21.) Young claims while he was

6   considered recovering, the Shipyard had no problem assigning him to work in Code 105.6; it

7   only denied his request for another temporary assignment to Code 105.6 after he was deemed

8   permanently disabled. According to Young, this was all part of a nefarious scheme on behalf of

9   Harper and Code 105 to make a "permanently disabled employee . . . someone else's problem."

10  (Id. at 22.) While Young's argument is compelling, it lacks foundation. Young's argument

11  hinges on a fact unsupported by the record: that Harper and Code 105.3 ever received Payne's

12  request for assistance. Payne could not directly request HRO to assign Young to Code 105.6; he

13  could only "let his direct supervisor know," and then wait. (Payne Dep. at 17–18.) But Harper

14  and Code 105.3 never received Payne's request. (Harper Dep. at 19.) Even when making all

15  favorable inferences in favor of Young, the record shows that not being assigned to Code 105.6

16  may have been the result of a miscommunication between Code management, but this is a far cry

17  from the smoking gun that Young makes it out to be. (See Resp. at 22.)

18      Additionally, Young makes much ado out of Payne being told to "shut up, in color,"

19  regarding his request for Young's help. (Resp. at 21.) But that is not what happened. Rather,

20  Payne checked in with his superiors regarding his request for Young's assistance, "was simply

21  told that the resource management office within Code 105 will handle it," and then "bit [his]

22  tongue and went back to work." (Payne Dep. at 21–22). Although Payne opines that this was out

23  of the ordinary, it is not the type of specific evidence needed to establish a genuine dispute of

24

1    material fact regarding pretext. At this stage, the Court requires more than mere conjecture to

2    show pretext.

3         What remains is Defendant's legitimate, non-discriminatory reason for not placing

4    Young in Code 105.6, namely that "Harper had not received a request from Code 105.6 for

5    Young's assistance and ordinary Shipyard procedure was to refer injured workers who could not

6    do work within their home code to the IWP for assignment." (Mot. at 12 n.2.) When viewed in

7    light of the same-actor inference, Young does not show that the factfinder could draw any

8    inference of discrimination from his assignment to IWP rather than Code 105.6. Therefore, the

9    Court GRANTS Defendant's motion for summary judgment on Young's second disability-

10   discrimination claim.

11   **C.    Young's retaliation claim**

12        Defendant argues that Young's retaliation claims should be dismissed because he failed

13   to include allegations of retaliation in his original EEO complaints and therefore failed to exhaust

14   his administrative remedies. (Mot. at 13–14.) The Court agrees.

15        Federal employees are "required to exhaust [their] administrative remedies with the

16   EEOC before pursuing [a] Rehabilitation Act claim in district court." Leong v. Potter, 347 F.3d

17   1117, 1121 (9th Cir. 2003). "[S]ubstantial compliance with the exhaustion requirement is a

18   jurisdictional pre-requisite." Sommatino v. United States, 255 F.3d 704, 708 (9th Cir. 2001).

19   "However, the district court has jurisdiction over any charges of discrimination that are 'like or

20   reasonably related to' the allegations made before the EEOC, as well as charges that are within

21   the scope of an EEOC investigation that reasonably could be expected to grow out of the

22   allegations." Leong, 347 F.3d at 1122 (quoting Sosa v. Hiraoka, 920 F.2d 1451, 1456 (9th Cir.

23   1990)).

24

1    Young failed to indicate on either of his EEO complaints that he was alleging that

2    Defendant retaliated against him due to a protected action. In both the formal and informal

3    complaint, Young was asked to specify the basis of his discrimination claims. (Strong Decl. Exs.

4    5 at 2; 6 at 2.) In both instances, he did not indicate that his claims sounded in "reprisal" for

5    engaging in protected activity. (Id.) Nor do the narratives provided in support of his EEO

6    complaints mention any subsequent action taken against Young after he filed his initial EEO

7    complaint. Finding no genuine issue of material fact as to whether Young exhausted his

8    administrative remedies, the Court GRANTS Defendant's motion as to Young's retaliation

9    claim.

10                                            **CONCLUSION**

11    Defendant's Motion is GRANTED IN PART and DENIED IN PART. Defendant has

12    shown that there is no dispute of material fact as to Young's discrimination claim related to his

13    assignment to the Injured Worker Program, and that he failed to exhaust his administrative

14    remedies regarding his retaliation claim. Therefore, Defendant's Motion is GRANTED as to

15    those two claims.

16    However, the Court DENIES Defendant's Motion as it pertains to Young's

17    discrimination claim related to the Code 400 contract specialist position. The evidence shows

18    that Defendant's legitimate non-discriminatory reason for denying him the position was false,

19    which under controlling precedent presents a question of material fact inappropriate for

20    determination on summary judgment.

21    The clerk is ordered to provide copies of this order to all counsel.

22    //

23    //

24

1    Dated September 25, 2024.

2

3                                              Marsha J. Pechman
                                               United States Senior District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24